**MURRAY, Plaintiff, v. OHIO BELL TELEPHONE COMPANY, Defendant.**

Common Pleas Court, Fayette County.

No. 21707.   Decided February 1, 1954.

418

Reed M. Winegardner, Washington C. H., for plaintiff.

Richard P. Rankin, Washington C. H., Landis, Ferguson, Bieser & Greer, Dayton, Ashley M. Van Duzer, Edwin N. Strand, Robert K. Houston, Cleveland, for defendant.

## OPINION

By CASE, J.

This matter is before this court on plaintiff's petition, herein filed on November 3, 1953, seeking an injunction and certain equitable relief against the discontinuance of service by the defendant telephone company.

In the petition it is asserted that plaintiff is a subscriber to the telephone service furnished by defendant, and has owned and used a Tele Magnet Electro Mechanical Telephone Answering Device in conjunction with the service so furnished by defendant since on or about March 1, 1953, and further alleges in part as follows:

"Plaintiff further says that said Tele Magnet Electro Mechancial Telephone Answering Device, being operated in connection with plaintiff's private telephone line, has not interferred, at any time, since its installation and operation, with telephone service for any other subscriber of the defendant company; that said instrument or device, owned by plaintiff, has not, at any time interferred with the proper operation of defendant's telephone installed and used at plaintiff's residence and/or place of business; that the device or instrument, described in this proceeding, has been and is now, a new development in rendering better and more complete telephone service; that the defendant has, or claims to have, a similar type of device or equipment, for automatically answering telephones and recording messages, that it allegedly rents to customers, on a monthly rate basis, that it is insisting plaintiff install and use in lieu of the equipment, described herein, that he now owns and uses.

"Plaintiff further alleges that he has no adequate remedy at law to recompense him for the damage he will suffer if defendant does, as it threatens to do, entirely and completely disconnect his telephone service for the reasons set forth above."

On November 3, 1953, this court made and issued a temporary restraining order against the defendant as follows:

"Upon application of the Plaintiff, supported by representations that Defendant has discontinued, terminated, suspended and refused telephone service to the Plaintiff as of November 2, 1953; and the Court being of the opinion (as set forth in its written opinion herein made and submitted of even date herewith) that in order to prevent great and irreparable injury to Plaintiff for which there is no adequate remedy at law, it is therefore

"ORDERED, DECREED AND ADJUDGED that Defendant shall, upon Plaintiff furnishing bond in the sum of $150.00,

be enjoined from discontinuing, terminating, suspending and refusing telephone service to Tom G. Murray, RFD No. 5, Washington Court House, Ohio, who is and was a subscriber listed and designated as Telephone Number 33491 in said Defendant's official directory for said service area; and that, in the event said service was discontinued, terminated and/or suspended, on or about November 2, 1953, said service shall be resumed to the same degree and extent enjoyed by said Tom G. Murray on November 1, 1953; and that said Defendant shall continue to render and furnish such service to said Plaintiff until the further order of the Court."

Subsequent thereto and in compliance therewith, defendant resumed and continued its service to plaintiff; and, on December 5, 1953, defendant filed the following motion herein:

"Now comes the defendant, The Ohio Bell Telephone Company and moves that the Court dismiss plaintiff's Petition and dissolve the temporary injunction heretofore issued herein on the ground that the Court has no original jurisdiction over the subject matter of the case."

On the same date, defendant filed its memorandum in support of said motion contending that plaintiff has attached to defendant's telephone a device not furnished or authorized by the defendant; that the utilization of said device by plaintiff is contrary to express provisions of defendant's tariff which read as follows:

"No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this tariff.

"In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to disconnect the same or to suspend the service during the continuance of said attachment or connection or to terminate the service."

and further contended that said provisions were "Approved by The Public Utilities Commission of Ohio in Orders Number 10,759, 21,755 and 21,996, issued January 6, 1939, August 22, 1950 and December 20, 1950, respectively."

Defendant's motion was heard on oral argument by counsel for both parties on January 25, 1954, at which time said counsel agreed to admission into evidence of certain exhibits marked as Defendant's Exhibits A through H, and Plaintiff's Exhibit 1.

Defendant's Exhibit A consisted of a certified copy of the company's application, filed on December 8, 1938, under P. U. C. O. Case No. 10,759, and reads in part as follows:

"To The Honorable

The Public Utilities Commission of Ohio

"1. Your applicant, The Ohio Bell Telephone Company respectfully represents that:

"a. It is a corporation under the laws of the State of Ohio and is duly authorized to engage in the telephone business therein.

"b. It is a public utility within the definition of §614-2a GC, and as such is subject to the jurisdiction of your Commission.

"c. For the furnishing of exchange service throughout its territory, your applicant maintains, in addition to the Exchange Rate Tariff filed for each of its exchanges, a governing General Exchange Tariff, P. U. C. O. No. 2, establishing certain rules, regulations and rates, a copy of which tariff is attached and identified as Exhibit "A," Sheets 1 to 35, inclusive.

"d. Except for a number of revisions made effective April 1, 1937 pursuant to the Order issued by your Honorable Commission on January 24, 1937 in Cause No. 3307, comparatively few revisions have been made in said General Exchange Tariff since it originally became effective on January 1, 1925. As a result of the availability of new and improved equipment arrangements, which are now regarded as standard, and because of a desire on the part of your applicant to establish, revise, rearrange and clarify regulations and practices, a general revision of the said tariff is warranted.

"2. Your applicant proposes, subject to the approval of your Honorable Commission:

"a. To revise, rearrange and reword said General Exchange Tariff, P. U. C. O. No. 2, to provide a text arrangement better suited for administrative use and to restate the existing rules, regulations and practices without changing the intent.

"b. To revise said tariff to provide for:

"(1) The establishment and modification of regulations and practices in order that said tariff will conform to present day requirements;

"(2) More liberal treatment in respect of certain items of facilities and services to the benefit of subscribers generally;

"(3) The establishment of rates and regulations applicable to certain items of equipment and facilities which are now regarded as standard and for which specific rates and regulations heretofore have not been included in said tariff.

"3. A more detailed statement of the revisions referred to in paragraph 2.b. above is attached and identified as Exhibit "B." Sheets 1 to 12, inclusive.

"4. The proposed revisions will not increase any rate, joint

rate, toll, classification, charge, or rental, to any existing subscriber.

"5. A copy of the proposed tariff schedule, designated P. U. C. O. No. 3, incorporating the revisions outlined in paragraph 2, above, is attached and identified as Exhibit "C," Sheets 1 to 84, inclusive.

WHEREFORE, your applicant respectfully requests that your Honorable Commission permit the filing of said proposed schedule and fix the time when the same shall take effect."

At the time of making said application, Defendant's P. U. C. O. No. 2 General Exchange Tariff contained the following provisions:

"N. UNAUTHORIZED ATTACHMENTS

"Subscribers shall not connect or permit to be connected to or with the equipment, facilities or other property of the Telephone Company, or use or permit to be used in. on or in connection therewith, any device, attachment or other thing not furnished or expressly approved by the Telephone Company; and the Telephone Company reserves the right, at its option, either to remove such device, attachment or other thing, or to discontinue the service of the subscriber or subscribers persisting in the violation of this regulation."
and, according to paragraph number 5 of said application, Defendant proposed that the above quoted paragraph be revised to read as follows:

"C. USE OF SERVICE AND FACILITIES
* * *

"2. Unauthorized Attachments or Connections

"No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this tariff. In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to disconnect the same or to suspend the service during the continuance of said attachment or connection or to terminate the service."

Defendant's Exhibit B consisted of a certified copy of the commission's order, dated January 6, 1939, in P. U. C. O. Case No. 10,759, which reads as follows:

"This day, this matter came on for consideration upon the application of The Ohio Bell Telephone Company for authority to file a proposed general exchange tariff, to be identified as P. U. C. O. No. 3, setting forth the explanation of the terms used in the tariff; general regulations appertaining to the obligations and liability of the Company, use of

service and facilities, establishment and furnishing of service, and the distribution, ownership and use of telephone directories; terms and conditions governing the furnishing of telephone directory listings, extension stations, joint-user service, combination main station service, initial contract periods, moves and changes, construction charges, mileage charges, foreign central office service and foreign exchange service; public and semi-public telephone service, private branch exchange service, order turrets, key equipments, miscellaneous, supplemental and special equipment, temporary suspension of service, service stations, connections with certain subscriber-owned facilities, connections with telephotograph equipment used by the Press, and toll terminals.

"The Commission, being fully advised in the premises, finds:

"That said application has been duly verified by one of the Vice-Presidents and the Secretary of the applicant.

"That the proposed filing is for the purpose only of modernizing, standardizing and bringing to date the applicant's general exchange tariff, and to accord its customers and the public a more liberal treatment with respect to certain facilities and service, and the establishment of rates and regulations applicable to certain items of equipment and facilities which are now regarded as standard, and for which specific rates and regulations heretofore have not been included in the general exchange tariff, and,

"That the proposed new schedule does not provide for the increase of any rate or charge now maintained by the applicant.

"It is, therefore,

"ORDERED, That said The Ohio Bell Telephone Company be, and hereby it is authorized to file the said proposed schedule and to make the same effective on the day following the date upon which two printed copies of the completed schedule are received at the offices of this Commission;

"Provided, however, that nothing herein shall be construed to be an approval by this Commission of the reasonableness or justness of any rate, charge, rule or regulation, nor binding upon the Commission in any future proceeding involving the reasonableness or justness of any rate, charge, rule or regulation."

Defendant's Exhibit C consisted of a certified copy of Section 2, Original Sheet No. 2, P. U. C. O. No. 3, General Exchange Tariff, effective March 1, 1939, as approved by the aforesaid order of the commission and which included therein the following language:

"C. USE OF SERVICE AND FACILITIES

\* \* \*

"2. Unauthorized Attachments or Connections

"No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this tariff. In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to disconnect the same or to suspend the service during the continuance of said attachment or connection or to terminate the service."

Defendant's Exhibit D consisted of a certified copy of the company's application, filed on August 16, 1950, under P. U. C. O. Case No. 21,755, which reads in part as follows:

"3. The conversion of said tariffs from typeset printing to offset printing will not establish any rate, joint rate, toll, classification, charge or rental or modify, amend, change, increase or reduce any existing rate, joint rate, toll, classification, charge or rental or any regulation or practice affecting the same.

"WHEREFORE, your applicant respectfully requests that your Honorable Commission permit the refiling, from time to time, of sheets of said tariffs in the form of offset printing, each such sheet to become effective on the date to be shown thereon, such date to be subsequent to the date of filing with your Commission."

Defendant's Exhibit E consisted of a certified copy of the commission's order, dated August 22, 1950, in P. U. C. O. Case No. 21,755, which reads as follows:

"This day, it appearing to the Commission from the verified allegations in said application that the taking of oral testimony herein is unnecessary, this matter came on for consideration upon the application of The Ohio Bell Telephone Company for authority to reissue, from time to time, without change in text all of the printed text sheets of its

"Exchange Rate Tariff, P. U. C. O. No. 1, General Exchange Tariff, P. U. C. O. No. 3, Private Line Tariff, P. U. C. O. No. 1, Mobile Telephone Service Tariff, P. U. C. O. No. 1. Message Toll Telephone Service Tariff, P. U. C. O. No. 6, and Teletypewriter Tariff, P. U. C. O. Teletypewriter No. 2 for the purpose of converting said tariffs from typeset printing to offset printing.

"The Commission, being fully advised in the premises, finds:

"That the conversion of said tariffs from typeset printing to offset printing will not establish any rate, joint rate, toll, classification, charge or rental or modify, amend, change,

increase or reduce any existing rate, joint rate, toll, classification, charge or rental or any regulation or practice affecting the same.

"It is, therefore,

"ORDERED, That said The Ohio Bell Telephone Company be, and hereby it is, authorized to refile, from time to time, sheets of said tariffs in the form of offset printing, such sheets to become effective on the date to be shown thereon, which date shall be subsequent to the date of the filing of such revisions with this Commission."

Defendant's Exhibit F consisted of a certified copy of the company's application, filed on December 1, 1950, in P. U. C. O. Case No. 21,996, which reads in part as follows:

"e. In order to include a number of additional definitions and to clarify existing definitions of terms used in the tariff, to clarify the intent of a number of existing regulations, to provide for greater facility in the administration of termination charges, to establish rates and regulations for certain items of equipment now regarded as standard, to withdraw text material no longer applicable, to establish certain new regulations, to discontinue certain existing regulations and to conform the rates for certain types of equipment and facilities now included in said tariff to the general level or rates for similar equipment and facilities now included in said tariff your applicant believes that Sections 1, 2, 3, 7, 8, 10, 13, 14, 15, 16 and 25 of said tariff, entitled Explanation of Terms, General Regulations, Directory Listings, Initial Contract Periods, Service Connections, Moves and Changes, Mileage Charges, Private Branch Exchange Service, Order Turrets, Key Equipments, Miscellaneous and Supplemental Equipment and Key Telephone Systems, respectively, should be revised.

"2. Your applicant proposes, subject to the approval of your Honorable Commission, to revise its General Exchange Tariff, P. U. C. O. No. 3, as shown on the statement attached hereto and made a part hereof, identified as Exhibit "B," Sheets 1 to 25, inclusive.

"3. The revisions proposed in paragraph 2 above will not increase any rate, joint rate, toll, classification, charge, or rental.

"4. A copy of each of the proposed schedule sheets, incorporating the revisions proposed in paragraph 2 above. is attached hereto and made a part hereof, identified as Exhibit "C," Sheets 1 to 47, inclusive.

"WHEREFORE, your applicant respectfully requests that your Honorable Commission permit the filing of each of said

proposed schedule sheets in the form attached hereto (or as they may be revised in order to reflect such revisions thereof as may become effective, pursuant to orders of your Commission, during the interim between the filing of this Application and the date upon which said proposed schedule sheets become effective), to become effective on the date to be shown thereon, such date to be subsequent to the date of filing with your Commission."

Defendant's Exhibit G consisted of a certified copy of the commission's order, dated December 20, 1950, which reads as follows:

"This day this matter came on for consideration upon the application of The Ohio Bell Telephone Company for authority to file proposed schedule sheets to be made a part of its General Exchange Tariff, P. U. C. O. No. 3, said sheets being attached to the application and identified therein as Exhibit "C".

"The Commission, being fully advised in the premises, finds:

"That said application has been duly verified by a Vice-President and by the Secretary of the applicant;

"That the principal changes proposed by the filing of said schedule sheets are to include a number of additional definitions and to clarify existing definitions of terms used in said tariff, to clarify the intent of a number of existing regulations, to provide for a greater facility in the administration of termination charges, to establish rates and regulation for certain items of equipment now regarded as standard, to withdraw text material no longer applicable, to establish certain new regulations, to discontinue certain existing regulations and to conform the rates for certain types of equipment and facilities now included in said tariff to the general level of rates for similar equipment and facilities now included in said tariff; and

"That the proposed revisions will not increase any rate, joint rate, toll, classification, charge or rental.

"It is, therefore,

"ORDERED, That said The Ohio Bell Telephone Company be, and hereby it is, authorized to file each of the said proposed schedule sheets in the form attached to the application (or as they may be revised in order to reflect such revisions thereof as may become effective, pursuant to orders of this Commission, during the interim between the filing of the application herein and the date upon which said proposed schedule sheets become effective), to become effective on the date to be shown thereon, which date shall be subsequent to the date of the filing of two complete printed copies of said sheets with this Commission.

"Provided, however, that nothing herein shall be construed to be an approval by this Commission of the reasonableness or justness of any rate, charge, rule or regulation, nor binding upon this Commission in any future proceeding involving the reasonableness or justness of any rate, charge, rule or regulation."

Defendant's Exhibit H consisted of a certified copy of Section 2, 5th Revised Sheet No. 4, P. U. C. O. No. 3, General Exchange Tariff, effective February 1, 1951, as approved by the aforesaid order of the commission and which included therein the following language:

"C. USE OF SERVICE AND FACILITIES (Cont'd)

"2. Unauthorized Attachments or Connections

"No equipment, apparatus, circuit or devise not furnished by the Telephone Company shall be attached to or connected with facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this tariff. In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to disconnect the same or to suspend the service during the continuance of said attachment or connection or to terminate the service."

Plaintiff's Exhibit 1 consisted of a copy of Section 28, Original Sheet No. 1, P. U. C. O. No. 3, General Exchange Tariff, effective March 15, 1951, and Section 28, 1st Revised Sheet No. 2, P. U. C. O. No. 3, General Exchange Tariff, effective March 15, 1952.

Original Sheet No. 1 of said Section 28 contains the following language:

"AUTOMATIC ANSWERING AND RECORDING SERVICE

"A. REGULATIONS

"1. The Telephone Company will furnish automatic answering and recording service which provides for the automatic answering of telephones, the transmission of a prepared message to the calling party and the automatic recording of a message from the calling party.

"2. The Telephone Company will furnish all equipment required for such automatic answering and recording service.

"3. Automatic answering and recording service is available for use with all exchange and private branch exchange stations where full selective ringing is employed. The service is not available at telephones where semi-selective or non-selective ringing is used.

"4. The automatic answering and recording equipment automatically disconnects the called telephone after the completion of the period provided by the equipment for recording incoming messages.

"5. Since the subscriber and calling parties have exclusive control over the quality and characteristics of speech used in the messages recorded, the Telephone Company has no liability for the quality of, or defects in, the recordings of such messages.

"6. The subscriber indemnifies and saves the Telephone Company harmless against all claims arising from the material transmitted over facilities furnished hereunder, including claims for libel, slander, fraudulent or misleading advertisements, infringement of copyright, or any other claims, and against all claims arising out of any act or omission of the subscriber or of the calling party in connection with facilities provided by the Telephone Company.

"7. Where the automatic answering and recording equipment provided by the Telephone Company involves the use of discs for recording the answering and incoming messages, one (1) answering and one (1) recording disc will be furnished at the time of installation without additional charge. Additional answering and recording discs will be furnished upon request in quantities of ten (10) or any multiple thereof at the rates specified in paragraph B, below."

The 1st Revised Sheet No. 2 of said Section 28 contains the following language:

"AUTOMATIC ANSWERING AND RECORDING
SERVICE (Cont'd)

"A. REGULATIONS (Concl'd)

"8. Automatic answering and recording service is furnished for a period ending March 15, 1954, and on an experimental basis only. At any time within said period the Telephone Company may discontinue such service and cancel the provisions of this tariff applicable thereto.

"B. RATES

"Automatic answering and recording service is furnished at the following charges:

| | Non-Recurring Charge | Monthly Rate |
|---|---|---|
| "Automatic answering and recording equipment, including, where required, one (1) answering and one (1) recording disc. | $15.00 | $12.50 |
| "Ten (10) additional answering discs | .50 | |
| "Ten (10) additional recording discs | 1.25 | |
| "Move (relocation of equipment on the same continuous property) | 5.00 | " |

## THE PLEADINGS

The plaintiff's petition herein prays for injunctive relief in the following language:

"WHEREFORE, plaintiff prays that upon the filing of this petition the defendant be enjoined from disconnecting said telephone line or lines and that it be required to furnish said telephone service, so long as all telephone bills for service are met promptly, during the pendency of this suit; that upon final hearing if it be determined that the defendant should supply continued telephone service, to plaintiff herein, then that said injunction and order be made permanent. Plaintiff further prays for such further relief, orders, and decrees that he may be entitled to in equity.".

The only pleading filed by defendant to plaintiff's petition herein is defendant's motion to dismiss said petition and to dissolve the aforesaid temporary injunction on the ground that the common pleas court has no original jurisdiction over the subject matter of the case.

## FACTS OF RECORD IN THIS PROCEEDING

The facts of record herein appear in the allegations as sworn to in plaintiff's petition, the judgment and order of the court heretofore made and issued, and the aforesaid exhibits admitted into evidence without objection at the hearing upon defendant's motion.

## DISCUSSION OF ISSUES RAISED BY DEFENDANT'S MOTION

The sole ground urged in defendant's motion for dismissal of plaintiff's petition and the dissolution of the temporary injunction heretofore issued reads as follows:

"* * * that the Court has no original jurisdiction over the subject matter of the case."

Obviously, the meaning and definition of the phrase, "subject matter of the case," must receive primary consideration in making appropriate analysis of the issues so raised. In Philips' work on Code Procedure, Section 291, the term "subject-matter" has been defined:

"The subject-matter of the action is the right asserted by the plaintiff, the ground upon which he demands a judgment of the court."

and, in Section 462 thereof, Philips states:

"The subject-matter of the action is the right asserted by the plaintiff, and upon which he demands a judgment of the court."

Rawle's Revision, Vol. 2, Bouvier's Law Dictionary, gives the following definitions:

"The cause; the object; the thing in dispute.

"It is a fatal objection to the jurisdiction of the court when it has no cognizance of the subject-matter of the action; as,

if a cause exclusively of admiralty jurisdiction were brought in a court having jurisdiction of civil cases only; 8 Mass. 87. In such case, neither a plea to the jurisdiction nor any other plea would be required to oust the court of jurisdiction. The cause would be dismissed by the court."

In Vol. 16, Page's Ohio Digest, entitled "Words and Phrases," under subtitle "SUBJECT OF ACTION," we find the following definitive comment:

"2. As used in code of civil procedure

"The phrase 'subject of the action,' as used in the code of civil procedure, is not limited to property and tangible objects. The subject of an action is either property or a violated right. **Baltimore & O. R. Co. v. Hollenberger, 76 Oh St 177, 81 N. E. 184.**

"The 'subject of the action' within §11254 GC, is the subject of judicial inquiry involved in a particular case. **Aetna Casualty Co. v. Lanz, 18 Abs 121.**

"3. Subject matter distinguished

"In their proper meaning the terms 'subject-matter,' 'subject of the action' and 'cause of the action' are not strictly synonymous, although they are often used interchangeably. **Baltimore & O. R. Co. v. Hollenberger, 76 Oh St 177, 81 N. E. 184.**"

At the hearing on the within motion, counsel for defendant conceded that the court of common pleas had such jurisdiction of the injunctive relief sought by plaintiff's petition to the extent that the court could and did properly grant a temporary injunction forthwith, without notice to the defendant of the petition filed herein, upon due consideration of how the rights of the parties hereto might be best protected with a minimum of injury to each, and pending subsequent proceedings within a reasonable time by virtue of which the court would become more fully informed concerning the law and any additional facts applicable and pertinent to the relief sought.

Defendant then argued that, by reason of defendant's motion, the authorities cited in its memorandum thereto, the defendant's contentions and citations presented during oral argument thereon, the defendant's exhibits of applications to and orders issued by the commission which were duly admitted as a part of the record herein, the court now has before it all essential elements of law and fact from which it must be concluded and determined that plaintiff's petition should be dismissed and the temporary injunction dissolved because this court "has no original jurisdiction over the subject matter of the case."

To support its contention, defendant argues that this court's decision and order, granting the temporary injunction herein, were based upon the court's finding and conclusion that the

tariff permitted the creation of a monopoly and was therefore unlawful; and that "the Court thus took upon itself jurisdiction to question the reasonableness and lawfulness of the rules or regulations of utilities on file with and approved by The Public Utilities Commission of Ohio," contrary to the express limitation of such jurisdiction to the Supreme Court of Ohio under the provisions of §4903.12 **R. C.** (formerly §549 GC):

"Jurisdiction. No court other than the supreme court shall have power to review, suspend, or delay any order made by the public utilities commission, or enjoin, restrain, or interfere with the commission or any public utilities commissioner in the performance of official duties."

Defendant also contends that legislative intent to confine original jurisdiction of questions regarding regulation of utilities to said commission is further evidenced by the provisions of §4909.02 **R. C.** (formerly §542 **GC**):

"All regulations, practices and service prescribed by The Public Utilities Commission shall be in force and be prima facie reasonable, unless suspended or found otherwise in an action brought for that purpose pursuant to Chapters 4901, 4903, 4905, 4907, 4909, 4921, 4923 and 4925 of the Revised Code, or until changed or modified by the Commission."

and, in support of its contention that the commission has exclusive original jurisdiction, defendant cites the case of U. S. v. Fritz, 89 F. Supp. 772, at page 777 thereof:

"The basis for the rule is the desire and need for expert administrative judgment on a technical question. The purpose is to prevent a party from bringing a controversy into Court prior to the securing of this administrative judgment on a question usually involving complex evidentiary material * * *."

Defendant also contends in support thereof that, by reason of the enactment of the public utility statutes, the Legislature intended to confine such original jurisdiction to the Commission is further evidenced by the provisions of §4905.26 **R. C.** (formerly §614-21 **GC**) which provide for hearing as follows:

"Upon complaint in writing against any public utility by any person * * * that any * * * schedule, classification or service * * * is in any respect unjust, unreasonable, unjustly discriminatory, unjustly preferential, or in violation of law, or that any regulation, measurement or practice affecting or relating to any service furnished by said public utility or in connection with such service, is, or will be, in any respect unreasonable, unjust, insufficient, unjustly discriminatory or unjustly preferential. * * *."

Defendant has also cited **State, ex rel., v. Geiger, 38 Oh Ap 253,** in which we find that the court held:

"1. Exclusive jurisdiction has been conferred upon the Supreme Court by the Constitution of Ohio to revise and review the proceedings of the Public Utilities Commission of Ohio in so far as the general subject-matter of the fixing of rates is concerned.

"2. The Public Utilities Commission has jurisdiction of the entire question of fixing rates.

"3. The Public Utilities Commission has full authority to hear and determine the question as to its own jurisdiction, and such question should be first raised before the commission before making an effort to secure a writ of prohibition to prevent it from hearing and determining such jurisdiction.

"4. The Public Utilities Commission is authorized to first pass upon the question of its own jurisdiction, and until it has determined that question, or refused to pass upon the same, there is no authority for the allowance of a writ of prohibition."

**Plaintiff's contention concerning equitable jurisdiction:**

In his memorandum contra defendant's motion and oral argument in support thereof, plaintiff contends that this court has equitable jurisdiction to impose temporary injunctive relief, during the pendency of this case, to make such interlocutory orders as may be necessary to preserve the rights of the parties in the subject-matter of the controversy.

The leading cases in Ohio, which appear to support plaintiff's contention, were cited and are noted as follows:

In the case of **State, ex rel., Cleveland v. Court of Appeals, 104 Oh St 96,** wherein the Supreme Court of Ohio held:

"1. The provisions of the act creating the public utilities commission, and conferring upon it jurisdiction to fix rates, in no way withdrew from the courts any of the equitable jurisdiction which they theretofore had.

"2. Where a municipality seeks to enforce an unaccepted ordinance rate against a gas company occupying its streets, and such gas company by way of defense alleges facts as to valuation, operating expense and source of supply, which, if true, amount at the ordinance rate to a confiscation of the property of the utility, a case is stated of which a court of equity will have jurisdiction.

"3. A court of equity has jurisdiction pending the final determination of a case to make such interlocutory orders as may be necessary to preserve the rights of the parties in the subject-matter of the controversy, and to attach to its orders. as a condition precedent to their taking effect, terms and limitations designed to serve the ends of justice."

In the case of **Dayton Street Transit Co. v. Dayton Power & Light Co., 57 Oh Ap 299, 10 O. O. 500,** although the court held according to paragraph 3 of the headnotes thereto:

"3. The Public Utilities Commission of Ohio has plenary and exclusive jurisdiction of public utilities furnishing service to the public and full jurisdiction to hear and determine all complaints that any consumer may make against the utility touching the adequacy of the service and the justness of the charges made by the utility."

it is to be noted, at page 304 of the court's opinion, that its decision was solely directed to whether, under the petition as framed, "there is any right in the court to make a declaratory judgment as to the existence of such statutory contract or the rights of the parties thereunder;" and that the court further stated:

"Such matters are exclusively within the purview of the Public Utilities Commission. This would leave the question whether the Court of Common Pleas, not having before it an existing contract, except so far as the same may be inferred from the fact that both parties are public utilities, and not having authority to pass upon the statutory contract existing by virtue of the Public Utilities Act in the filing of the defendant's schedule, could, upon the allegation that the defendant threatens to and will, unless restrained, deprive the plaintiff of the necessary power to the detriment of the public and the defendant, exercise jurisdiction to restrain the defendant.

"We do not feel called upon to pass upon the question as to whether the Court of Common Pleas would have jurisdiction to issue an injunction under such circumstances, or do we think it of importance at this time, as power is now being furnished and there is no present threat by the power company to withhold it."

It is further noted that the same court of appeals, some five years later (1942), in the case of **Western Ohio Public Service Co. v. Village of Yellow Springs, 37 Abs 414,** held:

"1. The provision of the Act creating the Public Utilities Commission and conferring upon it jurisdiction to fix rates in no way withdrew from the courts any of the equitable jurisdiction which they theretofore had, and does not preclude a public utility from applying to a court of equity for an injunction against the enforcement of a claimed confiscatory rate making ordinance.

"2. A gas rate would be confiscatory, if so low that the utility could not produce an income sufficient to take care of the essential expenses and leave a proper income upon the property to be paid to the stockholders.

"3. A public utility applying to a court of equity for relief from a rate making ordinance has the burden of proving by a preponderance of the evidence that the rate is confiscatory.

"4. A 5 per cent income permitted a natural gas distributor by a rate making ordinance is not confiscatory of the property which produced the same in the year 1942.

"5. The Common Pleas Court in an action by a public utility to enjoin enforcement or a rate making ordinance claimed confiscatory is not bound by the rules of the P U C used for determining rates, but is at liberty to consider such evidence as may enable it to fix the value of the property upon which the rate of income is to be determined."

It is also observed that Judge Geiger wrote each of the aforesaid opinions of said court of appeals, and that, in the latter case at pages 417 and 418, he stated in part as follows:

"Counsel for the village has presented authorities which he claims support the proposition that the Public Utility Commission alone has the jurisdiction and that the court is without authority to pass upon the questions here at issue. A number of cases are cited and discussed, but we feel we may safely rely upon the case of **State ex rel City of Cleveland v. Court of Appeals, 104 Oh St 96.** It is there held:

" 'The provisions of the act creating the Public Utility Commission and conferring upon it jurisdiction to fix rates in no way withdrew from the courts any of the equitable jurisdiction which they theretofore had.' "

It is further noted that the court of appeals for this district, in deciding the Yellow Springs case, supra, clearly followed the law as declared and established by the Supreme Court of Ohio in the City of Cleveland case, supra, and that in certain respects the law so established and followed was also in accord with a decision of the Court of Appeals for Defiance county in the case of **City of Defiance v. The Toledo Edison Co., 47 Oh Ap 100,** wherein that court held:

"1. Ordinance relating to rate for electric energy, accepted by electric company, constituted binding contract between company and city.

"2. Irrespective of jurisdiction conferred on Public Utilities Commission, courts have equitable jurisdiction to enforce and prevent breach of contracts between electric company and city relating to electric rates.

"3. Where gas company's change in rate and change in practice, made without order of Public Utilities Commission, was wholly illegal, court had jurisdiction to enjoin its enforcement, but such injunction would not prevent company from applying to commission for order to make change (§§614-8, 614-10, 614-20 and 614-21 GC).

"4. In suit by city against electric company to enjoin defendant from collecting certain charges, evidence of damage **held** sufficient to authorize issuance of injunction.

"5. Where action of electric and gas company, in making changes as to time of reading meters, was in violation of statute, injunction would lie without proof of damage to enjoin collection of charges in excess of rates provided by ordinance, accepted by company (§614-20 **GC**).

"6. Electric rate ordinances and schedules should be construed most favorably to public interest and welfare.

"7. Electric and gas company **held** not authorized to make minimum charges for any period other than period expressly provided for in rate ordinance and schedule of rates."

At page 106 of said opinion, it is noted that the court of appeals stated:

"The change made by the defendant was both a change in rate and change in practice, and was made without order by the Public Utilities Commission, and without authority in law. Being wholly illegal and void, the courts have jurisdiction to enjoin its enforcement. Such injunction, however, will not prevent the defendant from making application to the Public Utilities Commission for an order to make a change in rate or practice similar to the one attempted to be made by it, or the carrying into effect of such order as the commission may make."

and, at page 107 of its decision, the following language appears:

"Both the ordinance and the schedule of rates provided for a monthly minimum rate, and there is no express authority to defendant to make any change in these rates or to in any way prorate them. It is said in **O. Jur.**, at **page 288:** 'Where there is an ambiguity or uncertainty as to which of two constructions should prevail in a franchise contract, it is quite clear that that construction should be adopted by the courts that would be most favorable to the public interest and welfare, so the rule is well established that grants of this character should be strictly construed in favor of the public and against the grantee.' "

It is also noted that the court's reasoning appears to be in accord with the thinking of the Supreme Court of Ohio in the City of Cleveland case, supra, wherein at pages 104 and 105 that court stated in part as follows:

"And in the case of **City of Washington v. Public Utilities Commission, 99 Oh St, 70,** at **page 72,** this court held in a **per curiam** opinion: 'If the company felt that the ordinance of the city, which prescribed the rates to be observed by it, was indefinite, or invalid for any other reason, it could have at-

tacked the validity in a court of competent jurisdiction.' And again in the opinion of Judge Johnson in the case of **City of Cincinnati v. Public Utilities Commission, 98 Oh St, 320**, where this language was used at page 329: 'Notwithstanding this, if the city at any time should fix a rate which is so unjust or unreasonable and beneath a proper compensatory return as to amount to taking of the property of the company without just compensation, it would have recourse to the courts for the protection of its rights and property. * * *'

"In any event a holding that the remedy by appeal to the public utilities commission provided by the Code is exclusive could only be justified upon the theory that such remedy is adequate; and the averments of the answer and cross-petition present a situation which would render such remedy inadequate."

In the instant case at bar, plaintiff takes the position that he has no adequate remedy, by way of appeal or application to the Public Utilities Commission, which would preserve the **status quo** of the parties hereto pending a final determination of this case by the Public Utilities Commission; and that the situation presented by plaintiff's petition and defendant's motion, when considered in the light of the other facts of record as reflected by the exhibits, clearly justify and warrant the exercise of equitable jurisdiction by this court over the subject-matter of this controversy.

In further support of plaintiff's position, he cites the case of **Mahoning Bus Co. v. Gessner, Judge, 114 Oh St 652**, wherein the Supreme Court of Ohio, in a **per curiam** opinion, determined that, where an order of the Public Utilities Commission "does not include" the authorization claimed by a utility to be contained therein, then an injunctive order of the common plea court, restraining the exercise of the authority so claimed by the public utility, will not "impinge" upon the order of the commission; nor would such injunction "have the effect of suspending or delaying the order made by the commission."

**DISCUSSION OF THE FACTS OF RECORD**

Plaintiff's petition asserts certain facts concerning his ownership and use of a Tele Magnet Electro Mechanical Telephone Answering Device for approximately eight months prior to discontinuance of service by defendant on November 2, 1953, and it further asserts that his use thereof—

"* * * has not interfered, at any time, since its installation and operation, with telephone service for any other subscriber of the defendant company; that said instrument or device, owned by plaintiff, has not, at any time interferred with the proper operation of defendant's telephone installed and used at plaintiff's residence and/or place of business; that

the device or instrument, described in this proceeding, has been and is now, a new development in rendering better and more complete telephone service; that the defendant has, or claims to have, a similar type of device or equipment, for automatically answering telephones and recording messages, that it allegedly rents to customers, on a monthly rate basis, that it is insisting plaintiff install and use in lieu of the equipment, described herein, that he now owns and uses.'·

Defendant's Exhibit A shows that it made a certain application to the Public Utilities Commission, on December 8, 1938, wherein it represented in part as follows:

"d. Except for a number of revisions made effective April 1, 1937 pursuant to the Order issued by your Honorable Commission on January 24, 1937, in Cause No. 3307, comparatively few revisions have been made in said General Exchange Tariff since it originally became effective on January 1, 1925. As a result of the availability of new and improved equipment arrangements, which are now regarded as standard, and because of a desire on the part of your applicant to establish, revise, rearrange and clarify regulations and practices, a general revision of the said tariff is warranted.

"2. Your applicant proposes, subject to the approval of your Honorable Commission:

"a. To revise, rearrange and reword said General Exchange Tariff, P. U. C. O. No. 2, to provide a text arrangement better suited for administrative use and to restate the existing rules, regulations and practices without changing the intent."

Defendant's Exhibit A, attached to said application so filed with the commission, contained one of the regulations so proposed to be restated, "without changing the intent," to be as follows:

"N. UNAUTHORIZED ATTACHMENTS

"Subscribers shall not connect or permit to be connected to or with the equipment, facilities or other property of the Telephone Company, or use or permit to be used in, on or in connection therewith, any device, attachment or other thing not furnished or expressly approved by the Telephone Company; and the Telephone Company reserves the right, at its option, either to remove such device, attachment or other thing, or to discontinue service of the subscriber or subscribers persisting in the violation of this regulation."

Defendant's Exhibit B, in the case at bar, shows that the Public Utilities Commission made an order authorizing the defendant to file said schedule and make same effective subject to certain specific and express construction and reservations as follows:

"ORDERED, That said The Ohio Bell Telephone Company

be, and hereby it is authorized to file the said proposed schedule and to make the same effective on the day following the date upon which two printed copies of the completed schedule are received at the offices of this Commission;

"Provided, however, that nothing herein shall be construed to be an approval by this Commission of the reasonableness or justness of any rate, charge, rule or regulation, nor binding upon the Commission in any future proceeding involving the reasonableness or justness of any rate, charge, rule or regulation."

Defendant's Exhibit C, in the case at bar, shows the filing and effective dates of said provisions, and that same became effective on March 1, 1939.

Defendant's Exhibit D, in the case at bar, shows that defendant made a certain application to the Commission on August 16, 1950, wherein defendant represented, in part, as follows:

"3. The conversion of said tariffs from typeset printing to offset printing will not establish any rate, joint rate, toll, classification, charge or rental or modify, amend, change, increase or reduce any existing rate, joint rate, toll, classification, charge or rental or any regulation or practice affecting the same."

Defendant's Exhibit E, in the case at bar, shows that the Public Utilities Commission made an order, on August 22, 1950, authorizing defendant as follows:

"ORDERED, That said The Ohio Bell Telephone Company be, and hereby it is, authorized to refile, from time to time, sheets of said tariffs in the form of offset printing, such sheets to become effective on the date to be shown thereon, which date shall be subsequent to the date of the filing of such revisions with this Commission."

Defendant's Exhibit F, in the case at bar, shows that defendant made a certain application to the Commission on December 1, 1950, wherein defendant represented, in part, that said application was made:

"e. In order to include a number of additional definitions and to clarify existing definitions of terms used in the tariff, to clarify the intent of a number of existing regulations, to provide for greater facility in the administration of termination charges, to establish rates and regulations for certain items of equipment now regarded as standard, to withdraw text material no longer applicable, to establish certain new regulations, to discontinue certain existing regulations and to conform the rates for certain types of equipment and facilities now included in said tariff to the general level of rates for similar equipment and facilities now included in said tariff * * *"

Defendant's EXHIBIT "C"—SHEET 8, attached to said application so filed with the commission, contained the following restatement and addition to its tariff:

"C. USE OF SERVICE AND FACILITIES (Cont'd)

"2. Unauthorized Attachments or Connections

"No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with facilities furnished by the Telephone Company, whether physically, by induction or otherwise, except as provided in this tariff. In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to disconnect the same or to suspend the service during the continuance of said attachment or connection or to terminate the service."

Defendant's Exhibit G, in the case at bar, shows that the Public Utilities Commission made an order on December 20, 1950, authorizing defendant to file certain proposed schedule sheets in the form attached to said application subject to certain specific and express construction and reservations in the following language:

"ORDERED, That said The Ohio Bell Telephone Company be, and hereby it is, authorized to file each of the said proposed schedule sheets in the form attached to the application (or as they may be revised in order to reflect such revisions thereof as may become effective, pursuant to orders of this Commission, during the interim between the filing of the application herein and the date upon which said proposed schedule sheets become effective), to become effective on the date to be shown thereon, which date shall be subsequent to the date of the filing of two complete copies of said sheets with this Commission.

"Provided, however, that nothing herein shall be construed to be an approval by this Commission of the reasonableness or justness of any rate, charge, rule or regulation, nor binding upon this Commission in any future proceeding involving the reasonableness or justness of any rate, charge, rule or regulation."

Defendant's Exhibit H, in the case at bar, shows the filing and effective dates of said provisions, and that same became effective on February 1, 1951.

Plaintiff's Exhibit 1, in the case at bar, shows the filing and effective dates of certain provisions of defendant's tariff under which the telephone company would furnish automatic answering and recording service, and that such service became available on March 15, 1951, and would be furnished on an experimental basis only for a period ending March 15, 1954.

Since the defendant has not denied any of the allegations contained in plaintiff's petition, the facts averred therein

must be assumed therefore to be true for the purposes of considering defendant's motion to dismiss. Plaintiff avers that his automatic answering device is a new development and has been in use for more than eight months without interference in any way with defendant's service and facilities, and we must consider these averments to be true.

Defendant's Exhibits A, D and F are applications by which defendant claims it sought authority from the Commission to prohibit the use of the automatic answering device being used by plaintiff in conjunction with defendant's service; however, these exhibits clearly fail to show that said device had been developed, manufactured for sale, or even existed at the time said applications were filed with the Commission; and said exhibits also fail to show that said device was specifically mentioned therein or that any express authorization was sought with respect thereto.

It is axiomatic that the Commission speaks through its orders and grants no greater authority than the authorization sought by an application and sustained by the evidence adduced in support thereof. Therefore, since it does not appear that said device was developed or available at the stated times, when said applications were made to, considered and approved by the Commission, then it is clear that the records of said proceedings before the Commission did not contain any facts concerning said device, and that the Commission's orders (as shown by defendant's Exhibits B, E and G) did not by express language or clear implication authorize defendant to discontinue service to its subscribers who, as the plaintiff herein, would in later years own and use an answering device which would not in any way interfere with defendant's service and facilities.

While it cannot be denied that the Commission is presumed to possess and exercise expert administrative judgment on highly technical questions, it is equally clear, from the facts of record in the instant case, there is no evidence that said commission has ever investigated, considered or determined, from engineering or other factual data duly presented to it, that such a device so owned and used by plaintiff should be cause for discontinuance of defendant's service to its subscribers.

The express provisions of Defendant's tariff, whereby it claims authorization was granted to it and a duty was imposed upon it to discontinue its service to plaintiff, read as follows:

"No equipment, apparatus, circuit or device not furnished by the Telephone Company shall be attached to or connected with facilities furnished by the Telephone Company, whether

physically, by induction or otherwise, except as provided in this tariff. In case any such unauthorized attachment or connection is made, the Telephone Company shall have the right to disconnect the same or to suspend the service during the continuance of said attachment or connection or to terminate the service."

The last phrase of the first sentence thereof clearly states that the preceding provisions would not apply under certain exceptions provided in the tariff; and the language of the second sentence obviously contains permissive rather than mandatory language and, in addition thereto, clearly fails to impose any express or mandatory duty upon defendant to discontinue its service under the facts alleged in plaintiff's petition.

Assuming, for the purpose of argument, that the Commission had heard and had before it evidence concerning certain equipment, apparatus, circuits or devices which could be designated as "unauthorized attachments" which were not to be used by defendant's subscribers unless furnished by the telephone company, or unless used in accordance with the exceptions referred to in its tariff, then it is equally clear that such "unauthorized attachments" were expressly authorized by reason of said exceptions.

Obviously, the provisions in question do not impose any ministerial duty upon defendant to discontinue its service upon discovery of the use of such device under the facts stated in the plaintiff's petition; and it clearly appears from the language used therein that said tariff provisions are ambiguous and indefinite.

When such ambiguity is coupled with the total absence of any ministerial duty imposed upon defendant, then it must be conceded that said tariff provisions do not require defendant to discontinue its service to plaintiff, and that defendant could not be subject to the $1,000 per day maximum penalty provided by statute, for each day of the eight month period, during which it objected to but permitted the use of said device, under the facts stated in plaintiff's petition.

It is equally clear that there is no similarity between the orders shown in defendant's exhibits in the instant case and the Commission's gas emergency orders which imposed definite and certain ministerial duties concerning the disconnecting and termination of service as reviewed and determined by the Supreme Court of Ohio in the cases of **City of Akron v. Public Utilities Commission, 149 Oh St, 347, and Cincinnati Gas & Electric Co. v. Public Utilities Commission, 157 Oh St, 574.**

Defendant's memorandum in support of its motion contends

that failure to dismiss plaintiff's petition herein and to dissolve the temporary injunction heretofore issued would result in compelling defendant to violate its tariff. The facts of record herein clearly do not support such contention. Therefore, the use of plaintiff's device for any period of time, whether unauthorized as claimed by defendant, or authorized under the express exceptions stated in its tariff or as a result of a restraining order of the common pleas court, could not and would not compel defendant company to violate a duty which does not exist as shown by the facts of record in this proceeding.

Obviously, it is only by the authority which defendant claims it has, and not by definite and express provisions set forth in said tariff, that defendant would appear to be utilizing such provisions of its tariff so as to create a monopoly that would be contrary to public policy and against public interest. Clearly a public utility cannot grant unto and impose upon itself, by its own construction and interpretation of the commission's orders herein, such authority and duty which are not definitely set forth therein as a matter of record; and the Supreme Court of Ohio, in effect, has so held in the case of **Mahoning Bus Co. v. Gessner, Judge, 114 Oh St 652.**

**FINDING OF FACTS**

The court finds, from all of the pleadings and exhibits of record herein, that plaintiff purchased and used, for eight months prior to the commencement of this action, the automatic answering device described in his petition; that the use thereof, in conjunction with defendant's telephone service to plaintiff, did not at any time or in any way interfere with the telephone service and facilities furnished and owned by defendant; and that on November 2, 1953, the defendant discontinued its service to plaintiff and threatened to suspend further service pending plaintiff's continued use of said answering device.

The court further finds, from the pleadings and exhibits admitted herein, that defendant made three certain applications to the Public Utilities Commission of Ohio for authority to file and make effective certain tariff provisions; that in no one of said applications so filed did defendant seek definite and specific authorization to discontinue telephone service to its subscribers who would use in conjunction therewith the automatic answering device being used by plaintiff herein; that the Public Utilities Commission issued certain orders granting said applications so filed by defendant subject, however, to the following conditions:

"Provided, however, that nothing herein shall be construed to be an approval by this Commission of the reasonableness

or justness of any rate, charge, rule or regulation, nor binding upon this commission in any future proceeding involving the reasonableness or justness of any rate, charge, rule or regulation."

that said device, being used by plaintiff herein, was developed and manufactured subsequent to the last of said orders so made by the commission; that said commission did not have before it, at any time prior to the issuance of said orders, any engineering or other factual data from which it could determine that the use of said device should be cause for discontinuance of defendant's service to its subscribers; that the record herein fails to show that said commission has at any time made such investigation to determine whether the use of said device by telephone subscribers in Ohio should be prohibited; and that the provisions of said tariff, whereby defendant claims authorization to discontinue service to plaintiff, are ambiguous and indefinite and do not impose any express duty upon defendant to discontinue its service to plaintiff for using said device.

## CONCLUSIONS OF LAW

The facts alleged in plaintiff's petition state a cause of action for which there is no adequate remedy at law.

The act creating the Public Utilities Commission does not confer upon it jurisdiction to grant equitable relief **pendente lite,** without notice, or in any way as to best protect the rights of all interested parties upon the filing of a complaint respecting tariff matters subject to its regulation.

The act creating the Public Utilities Commission, and conferring upon it jurisdiction to regulate conditions of service, in no way withdrew from the courts equitable jurisdiction to make such interlocutory orders as may be necessary to preserve the rights of the parties in the subject-matter of the controversy, and such court of equity has jurisdiction, pending the final determination of a case, to attach to its orders, as a condition precedent to their taking effect, terms and limitations designed to serve the ends of justice.

Where facts of record show a plaintiff-subscriber has owned and used an answering device for eight months without in any way interfering with telephone service and facilities furnished by the telephone company, and that defendant company had discontinued and threatened to suspend such service during plaintiff's continued use of said device, a court of equity has jurisdiction to make and issue a temporary restraining order against defendant company without notice and pending such subsequent hearings and further orders of the court designed to serve the ends of justice.

When such defendant moves for dismissal of plaintiff's

petition and dissolution of such temporary restraining order and introduces as evidence in support thereof certain applications it had previously made to, and certain orders issued by, the Public Utilities Commission of Ohio, resulting therefrom; and when said applications and orders fail to disclose that defendant had presented to said commission any engineering and related factual data from which said commission could find and determine that the use of said device should be prohibited; and when said orders so made by said commission fail to disclose that it had found and determined the use of said device would be reasonable and just cause for discontinuance of telephone service to defendant's subscribers; then defendant has failed to show good cause for dismissal of plaintiff's petition and dissolution of said temporary restraining order.

The Public Utilities Commission of Ohio has plenary and exclusive jurisdiction to hear and make final determination as to whether continued use of said device should be reasonable and just cause for discontinuance of telephone service to defendant's subscribers.

Under the facts of record in this proceeding, the Public Utilities Commission of Ohio has made no order with which the temporary injunction heretofore issued by this court is attempting to delay, review or suspend; nor does said temporary restraining order attempt to enjoin, restrain, or interfere with said Commission or any Public Utilities Commissioner in the performance of official duties.

**JUDGMENT OF THE COURT**

In order to avoid any unreasonable delay in invoking said commission's jurisdiction and to readily obtain such final determination as lies within the exclusive jurisdiction of the Public Utilities Commssion of Ohio, this court should extend its injunctive order heretofore issued for such time as would be reasonably necessary and required for filing such application with, and for such final determination thereof by, the Public Utilities Commission of Ohio; and the court should attach to such extension the condition that, upon the failure of plaintiff-subscriber to so make and file such application within sixty (60) days from the date of the journal entry so extending said temporary restraining order, then said temporary injunction should forthwith terminate and cease to have any force and effect and the costs herein accrued should be taxed and adjudged against said plaintiff.

Therefore, in the light of the law and facts of record and upon all of the aforesaid findings, it is the decision of this court that defendant's motion to dismiss plaintiff's petition and to dissolve said temporary injunction is not well made and should be overruled for the reasons above set forth.

Counsel for plaintiff may prepare an entry accordingly which will include therein appropriate notation of exceptions on the part of both plaintiff and defendant to the aforesaid findings, decision and such entry, and thereupon submit same to counsel for defendant and to this court for approval.